**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

DAVID E. KERNS, JR.,                    :

     Plaintiff,                    :
                                   Case No. 3:09cv00087

 vs.                    :

                                       District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,                    :     Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                    :

     Defendant.                    :

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

     Plaintiff David E. Kerns applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in December 2003 asserting that he was under a disability due to panic attacks, chemical imbalance, thyroid problems, asthma, and depression. (Tr. 122). After the Social Security Administration initially denied his applications, an Administrative Law Judge (ALJ) held a hearing in Orlando, Florida, during which Plaintiff was represented by counsel. The ALJ later issued a written decision denying Plaintiff's DIB and SSI applications. (Tr. 45-51). The Appeals Council granted Plaintiff's request for review and remanded the matter for further consideration. (Tr. 81-84).

     On remand an ALJ in Dayton, Ohio, James I.K. Knapp held a second hearing, during which Plaintiff was not represented by counsel. (Tr. 377-409). ALJ Knapp later

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

issued a written decision denying Plaintiff's DIB and SSI applications. In doing so, ALJ Knapp concluded that Plaintiff was not under a "disability" within the meaning of the Social Security Act. (Tr. 19-34).

ALJ Knapp's decision eventually became the final decision of the Social Security Administration. This Court has jurisdiction to review such final decisions. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing the ALJ's decision and granting him benefits. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

### A.    Plaintiff and His Testimony

On the date of ALJ Knapp's decision, Plaintiff's age (35 years old) placed him in the category of a "younger individual" for social security purposes. *See* 20 C.F.R. §§404.1563(c); 416.963(c).[2] Plaintiff completed the ninth grade and has a "limited" education. (Tr. 119). His past jobs included short-order cook, farm laborer, and restaurant manager. (Tr. 123, 131-38).

Plaintiff claimed in his DIB and SSI applications that his disability began on October 1, 2002.

Plaintiff testified during ALJ Knapp's hearing that he last worked in October 2002. (Tr. 382). His employment ended after he got into a fight. He explained that he "just couldn't handle the stress...," and he ended up hitting the boss. *Id*.

Plaintiff testified that he began to have panic attacks in 1990 when he was locked

---

[2]  The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI Regulations.

in a retail store while working third shift. (Tr. 385). He stated, "[I] just got a really overwhelming panic ... I needed to get out of there. I needed to leave...." *Id.* But, the night supervisor told Plaintiff that he could not leave because it would set off fire alarms. This led to an argument and eventually Plaintiff swung a broom at his supervisor. *Id.*

At the time of ALJ Knapp's hearing, Plaintiff was not under the care of psychiatrist or psychologist, although he was taking Paxil and it was helping. (Tr. 385-86). If he skipped his dose he got irritable, grouchy, and moody. *Id.* Plaintiff testified that he also has depression and that he engaged in compulsive behavior like counting every stop light he drives by. (Tr. 387). He did not go out much. *Id.*

Plaintiff further testified that he has asthma, takes medication, and uses a nebulizer at least every two days. (Tr. 388). He has been told to lose weight, but he cannot exercise. He has tried but it feels like he is having a heart attack. *Id.*

Plaintiff estimated that he gets short of breath after walking a half block. (Tr. 392). He can stand for twenty minutes at a time but then would need to move around. He is anxious when he sits and he needs to walk around. He estimated he could lift only ten pounds. (Tr. 393).

As to his daily activities, Plaintiff testified that would get up around 2:00 p.m., then clean the house, vacuum, dust, make the beds, pull out the furniture, clean the curtains, clean the bathroom, and do the laundry. (Tr. 389). He shops with his wife or one of their children. (Tr. 390). He visits with a neighbor. He only sees his brother about once a month even though he lives nearby. *Id.*

**B.  Medical Evidence**

**Seven Rivers Community Hospital**

On October 24, 2003, Plaintiff sought emergency room treatment after experiencing shortness of breath, chest fluttering, and palpitations while at work. (Tr. 199-210). He reported a history of panic attacks and that he drank three two-liter bottles of Coca-Cola a day. Plaintiff was alert and oriented, and his mood and memory were

normal.  (Tr. 203).  A chest x-ray was normal.  (Tr. 207).  An EKG was normal.  (Tr. 205).  Plaintiff was instructed to decrease caffeine intake.  (Tr. 199).

### Nurse Practitioner Heidi B. Crowe MS, ARNP

Plaintiff saw Ms. Crowe from October to December 2003.  (Tr. 211-16).  Ms. Crowe's initial assessment indicates that Plaintiff's chief complaint was, "I've had anxiety for 10 years."  (Tr. 215).  He had also experienced his first panic attack 10 years earlier.  Ms. Crowe wrote, "His panic was so severe he couldn't leave his house because he was afraid he would have a panic attack.  When out he would always sit as close to exits as he could in case he had an attack – he doesn't want people to see him have an attack."  (Tr. 215).

At the time he was seeing Ms. Crowe, Plaintiff was living with his wife and four children.  *Id.*  He was slightly overweight.  He was pleasant and cooperative.  His speech was nonpressured and relevant.  *Id.*  His thought process was well-organized, and he had no impairment in abstract thinking.  (Tr. 215-16).  Plaintiff's mood was tense; he had a full range affect.  *Id.*  Plaintiff was alert and oriented, his memory was intact, and he had good judgment and fair insight.  *Id.*  Ms. Crowe diagnosed panic disorder with agoraphobia and assigned a Global Assessment of Functioning (GAF)[3] of 45, indicating "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...."  Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (DSM-IV-TR) at 34.  (Tr. 216).

In November and December 2003, Ms. Crowe reported that Plaintiff was alert and oriented, his mood was euthymic, and he had a bright affect.  His speech was rapid, non-pressured, and his thought process was well organized with negative focus.  (Tr. 212,

---

[3]  "GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

214).

**Steven L. Weiss, Ph.D., P.A.**

In May 2004 Dr. Weiss performed a psychological examination of Plaintiff for the Florida Bureau of Disability Determinations. (Tr. 218-20). Dr. Weiss noted, "The claimant presented with allegations of a panic disorder, chemical imbalance, thyroid, asthma conditions, and depression." (Tr. 218). Plaintiff reported that he dusted, vacuumed, supervised the children on their chores, watered the plants, did activities in the yard, rinsed the dishes, cooked dinner, and did the laundry. Plaintiff was 5'4" in height and weighed 254 pounds. (Tr. 218).

Plaintiff told Dr. Weiss that his panic attacks began in June 1991 when he was 18 years old. His panic-attack symptoms included tightness in his chest, difficulty breathing, cold sweats, nausea, palpitations, and clamminess all over his body. Plaintiff told Dr. Weiss that "he gets one to two attacks on a normal day but may get more attacks if he has somewhere to go. Attacks are intensified when he is in public. He reported that most of them last from four to five minutes in duration but some attacks last longer." (Tr. 218). "He further reported that he is afraid to leave the house and does not like to be left alone. There is a fear of dying, a reluctance to be around others, especially crowds, and fears of taking medication." *Id.*

Dr. Weiss' mental status examination revealed that Plaintiff's mood was anxious and his affect was appropriate to mood. Plaintiff was oriented, his memory was intact, and his "[i]nsight and judgment were reflective of knowledge of right from wrong with some implusivity." (Tr. 219). Dr. Weiss diagnosed panic disorder with agoraphobia, anxiety disorder NOS, and depressive disorder (recurrent, moderate). (Tr. 220).

**John Wright, Ph.D.**

In May 2004 Dr. Wright, a record-reviewing psychologist, completed a Psychiatric Review Technique form. (Tr. 221-38). Dr. Wright diagnosed Plaintiff with depression

(Tr. 224) and panic disorder with agoraphobia (Tr. 226). He opined that Plaintiff had no restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 231). Dr. Wright further opined that Plaintiff could work in a "low social interaction demand work setting." (Tr. 233).

**Parmanand Gurnani, M.D.**

Plaintiff saw psychiatrist Dr. Gurnani on September 22, 2004. Dr. Gurnani diagnosed a panic disorder with agoraphobia and major depressive episode, chronic, recurrent, and severe without psychosis. He assigned a GAF of 55, referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34. (Tr. 251). Dr. Gurnani identified Plaintiff's target problems as panic attacks and depression. *Id.* He discontinued Zoloft and Klonopin and prescribed Paxil and Xanax. (Tr. 249-53, 270). Plaintiff continued to see Dr. Gurnani through November 2005. (Tr. 271-77, 298-99).

**A. Alvarez-Mullin, M.D.**

In November 2004 Dr. Mullin, a record-reviewing psychiatrist, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment. (Tr. 254-69). Dr. Mullin indicated that Plaintiff had "major depressive episode, recurrent, severe without psychosis (symptoms appear moderate rather than severe)." (Tr. 257). Dr. Mullin also diagnosed Plaintiff with "panic disorder with agoraphobia; anxiety disorder (NOS)." (Tr. 259). Dr. Mullin believed that Plaintiff had mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 264). Dr. Mullin opined that Plaintiff "may become more anxious in crowds and may have difficulty accepting criticisms but could [a]dequately be able to work in a relative small/low pressure/predictable environment."

(Tr. 269).

**Donald Turner, D.O.**

In February 2006 Dr. Turner completed a two-page Basic Medical form. (Tr. 302-03). At that time Plaintiff's height was 68 inches; he weighed 263 pounds. Dr. Turner listed Plaintiff's conditions as hypertension, anxiety, depression, panic attacks, asthma, and hypothyroidism. According to Dr. Turner, Plaintiff could stand walk 45 minutes every 1½ hours; his could sit an unlimited amounted of time; and he could lift/carry up to 5 pounds for periods of 5 minutes. He was extremely limited in bending and reaching, and moderately limited in pushing and pulling, and moderately limited in performing repetitive foot movements. (Tr. 303). Dr. Turner concluded that Plaintiff was unemployable for 12 months or more. (Tr. 303).

**Damian M. Danopulos, M.D.**

Dr. Danopulos examined Plaintiff in April 2007 for the Ohio Bureau of Disability Determinations (Ohio BDD). (Tr. 304-23). At that time Plaintiff's height was 67½ inches and he weighed 264 pounds. His lungs were clear to auscultation and percussion and there was no labored breathing. Pulmonary function studies showed mild obstructive lung disease without restrictive component.

Dr. Danopulos noted the following objective findings: "1) History of asthma, 2) mild degree obstructive lung disease, 3) being on supplemental thyroid, 4) morbid obesity, 5) anxiety and depression." (Tr. 308). Dr. Danopulos concluded that Plaintiff's "ability to do work activities was affected in a negative way from the combination of asthma and early emphysema and obesity." (Tr. 308).

**Giovanni M. Bonds, Ph.D.**

Dr. Bonds performed a psychological evaluation of Plaintiff in May 2007. (Tr. 325-32). Plaintiff told Dr. Bonds that he lived with his wife and three children. (Tr. 325). His fourth child had turned 18 and lived outside the family home. (Tr. 325). Plaintiff did not have friends with whom he discussed his problems. (Tr. 326). He was 5'8" in height

and weighed 254 pounds. He was cooperative; his speech was clear and understandable, although somewhat pressured; and his thought processes were logical, coherent, and goal-directed.

Dr. Bonds described Plaintiff's mood as angry and irritable. (Tr. 328). His affect was appropriate, he was alert and oriented, and he had sufficient judgment. Dr. Bonds explained that Plaintiff "seemed very hostile, irritable, tense and on edge. He made threatening remarks to the examiner and complained about the evaluation procedures. He did eventually relax and complete the interview in the usual way...." (Tr. 330).

Dr. Bonds diagnosed panic disorder with agoraphobia and bipolar disorder and assigned a GAF of 50, indicating "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." DSM-IV-TR at p. 34. (Tr. 330-31).

Dr. Bonds believed that Plaintiff's ability to relate to peers, supervisors, or the public was severely limited; his ability to understand, remember, and follow directions was not significantly limited; his ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was mildly impaired; and his ability to with stand the stress and pressure of day to day activities was severely limited. (Tr. 331).

Dr. Bonds also completed a form indicating his opinion that Plaintiff's ability to understand, remember, and carry out instructions was not affected by his mental impairment. (Tr. 333). Plaintiff had a marked impairment in his ability to interact with the public, supervisors, and coworkers; and he had a moderate impairment in his ability to respond appropriately to usual work situations and changes in a routine work setting. Plaintiff's ability to persist on tasks was mildly limited. (Tr. 334-35).

### Mary Buban, Psy.D.

Psychologist Dr. Buban testified during ALJ Knapp's hearing in November 2007. (Tr. 394-404). Dr. Buban testified that she was "extremely confused ... about when the panic attacks started. There are allegations they started in the ... teenage years. There are

allegations they stated when he was standing in an unemployment line.  There are allegations they started ... after he was working at the fast food restaurant.  And today he said they started when he was working at the toy store...."  (Tr. 394).

After describing the mental health records, Dr. Buban testified, "What I see in the record is ... that initially when treatment [was] provided, [they] did attempt to start him in a program of therapy that would have addressed the complaints of anxiety panic disorder.  I don't see that there was appropriate, appropriate follow-through.  I just don't have documentation that ... the exercising and various techniques for dealing with an anxiety disorder were utilized or learned....  He just has not consistently been in treatment.  There are some inconsistencies regarding ... the length, severity and duration of the panic disorder and also the historical factors around it....  When he complains about the impulse control and the anger outbursts, those typically do not occur with a panic disorder...."  (Tr. 400).

Dr. Buban identified asthma as complicating factor, which she noted could be a consequence of anxiety.  (Tr. 401).  She further noted that Plaintiff's caffeine use "may still be a complicating factor."  *Id.*

Dr. Buban opined that Plaintiff should be limited to no dealing with the public, no close over-the-shoulder supervision, occasional contact with coworkers (with no job involving teamwork on a specific task), and simple repetitive tasks.  (Tr. 401-02).

## III.  ADMINISTRATIVE REVIEW

### A.  "Disability" Defined

The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

## B.    ALJ Knapp's Decision

ALJ Knapp resolved Plaintiff's disability claim by using the five-Step sequential evaluation of evidence required by the Regulations. *See* Tr. 19-20, 32-33; *see also* 20 C.F.R. §404.1520(a)(4). ALJ Knapp concluded, in pertinent part, that Plaintiff had three severe impairments: asthma, mild obesity, and generalized anxiety disorder with secondary recurrent depression (Step 2). The ALJ then concluded that Plaintiff did not have an impairment or combination of impairments that meet or equaled the criteria in the Commissioner Listings[4] (Step 3).

The ALJ assessed Plaintiff's residual functional capacity (Step 4) as follows:

> [Plaintiff] lacks the residual functional capacity to: (1) lift more than 20 pounds frequently or 50 pounds occasionally; (2) stand for more than 30 minutes at a time or more than a total of three hours in a workday; (3) walk for more than five minutes at a time or more than a total of one hour in a workday; (4) do greater than occasional crawling, crouching, stooping or climbing stairs; (5) work at temperature extremes, in wet or humid areas, or where there would be concentrated exposure to fumes, smoke, dust, odors, or poor ventilation; (6) perform jobs involving significant exposure to background noise; (7) have any contact with the public; (8) have greater than occasional contact with supervisors (with no job involving over-the-shoulder job supervision); (9) have greater than occasional contact with co-workers (with no job involving a requirement to work as part of a team on specific work related projects); or (10) do other than low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous). While he can lift at a medium level, the standing and walking restrictions are such that he is limited to a

---

[4]  The Listings are found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

reduced range of light work.[5]

(Tr. 28, 32-33) (footnote added).  The ALJ further found that Plaintiff was unable to perform his past relevant work (also Step 4).  And the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy (Step 5).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.  (Tr. 19-34).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..."  *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir.

---

[5]   The Regulations define light work as involving the ability to lift " no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b).

2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V.     DISCUSSION

### A.     Plaintiff's First and Second Claimed Errors

In his first and second assertions, Plaintiff claims:

1.      The ALJ failed to evaluate the medical and testimonial evidence in accordance with law and the mandate of the Appeals Council and acted as his own medical expert at Step 2 in determining that Plaintiff's 'severe' impairments are 'asthma; mild obesity; and generalized anxiety disorder with secondary recurrent depression.' (Tr. 32).

2.      The error committed at Step 2 in evaluating the medical and testimonial evidence carried through the sequential evaluation to Steps 3, 4, and 5, and skewed the RFC determination resulting in an erroneous assessment of the mental limitations related to Plaintiff's impairments and decision on disability.

### 1.
### Physical Impairments

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544.

12

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.927(d), (f); *see also* Ruling 96-6p at *2-*3.

Plaintiff contends that the ALJ erred by basing his findings on his own intuitive medical diagnoses "in derogation of the medical opinion evidence." (Doc. #8 at 10). Plaintiff points out that he has been diagnosed with "early emphysema" and that Dr. Danopulos stated explicitly, "'His ability to do work-related activities is affected in a negative way from the combination of his asthma and early emphysema and obesity." (Doc. #8 at 11)(quoting Tr. 308). Plaintiff emphasizes that Dr. Danopulos mentioned early emphysema five times as a reason for Plaintiff's physical limitations and likewise characterized Plaintiff as "morbidly obese" (Tr. 308) in contrast to the ALJ's finding of mild obesity.

The ALJ based his assessment of Plaintiff's Residual Functional Capacity for

physical work on Dr. Danopulos' opinions and test results during his April 2007 examination of Plaintiff. (Tr. 28-29, 304-23). Plaintiff has not shown that the ALJ failed to apply the correct legal standards to his evaluation of Danopulos' opinions. *See* Doc. #8 at 10-13. He instead challenges the ALJ's failure to accept two diagnoses – early emphysema and morbid obesity – by Dr. Danopulos. This did not constitute error, however, because a mere diagnosis alone is not determinative of the ultimate disability issue. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *see also Young v. Secretary of HHS*, 925 F.2d 146, 151 (6th Cir. 1990)("a claimant must do more to establish a disabling mental impairment than merely show the presence of a dysthymic disorder."); *Kennedy v. Astrue*, 247 Fed.Appx. 761, 767 (6th Cir. 2007)("mere diagnosis of obesity does not establish either the condition's severity or its effect on [the claimant's] functional limitations."). Similarly, Dr. Danopulos' conclusion that the combination of Plaintiff's "asthma and early emphysema and obesity" had a negative effect on Plaintiff's work abilities (Tr. 308), without more, does not contradict the ALJ's assessment of Plaintiff's Residual Functional Capacity for physical work, particularly when Dr. Danopulos provided more specific test results. For example, Dr. Danopulos documented that Plaintiff's pulmonary testing showed only a "[m]ild degree of obstructive lung disease without [r]estrictive component." (Tr. 315). Dr. Danopulos also thought that Plaintiff's early emphysema did not greatly restrict his ability to lift and carry. This is seen in Dr. Danopulos' opinion that Plaintiff could lift up to fifty pounds occasionally and up to twenty pounds frequently, even though he had early emphysema. (Tr. 318).

Plaintiff's further contention – that the ALJ relied on his own intuition – lacks merit. The ALJ based his obesity finding on the lack of evidence of gait abnormalities or any significant musculoskeletal limitations. The absence of such evidence tends to show that Plaintiff's obesity – whether considered mild or morbid – did not significantly reduce his physical abilities. Again, this was the proper analytical focal point – what Plaintiff

could and could not do – rather than what diagnoses Plaintiff have been given. *See Higgs*, 880 F.2d at 863; *see also Young*, 925 F.2d at 151; *Kennedy*, 247 Fed.Appx. at 767.

For the above reasons, Plaintiff's arguments do not reveal that the ALJ committed legal error when evaluating Dr. Danopulos' opinions, and Dr. Danopulos' opinions and test results constitute substantial evidence in support of the ALJ's assessment of Plaintiff's Residual Functional Capacity for physical work.

**2.**
**Mental Impairments**

Plaintiff contends that the ALJ erred by relying on the opinions of psychologist Dr. Buban and further erred by substituting his own judgment that Plaintiff had "generalized anxiety disorder with secondary depression" (Tr. 32) in place of the stated diagnoses of the examining physicians. Plaintiff emphasizes that all the examining physicians of record diagnosed Plaintiff with, for example, panic disorder with agoraphobia, anxiety, and bipolar disorder. Plaintiff further contends that if the ALJ had properly evaluated Plaintiff's mental impairments, as diagnosed by treating and examining physicians of record, it would have led to the conclusion that Plaintiff's conditions satisfied Listing 12.04 for affective disorders and Listing 12.06 for anxiety-related disorders.

To satisfy his burden at Step 3, Plaintiff must show that his impairments meet all of the criteria in Listing 12.04 or 12.06. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530. Similarly, to show that he equals a listed impairment, Plaintiff must "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Zebley*, 493 U.S. at 531. It is not enough for Plaintiff to show that the overall functional impact of his impairment is as severe as that of an impairment in the Listings. *See Zebley*, 493 U.S. at 351.

Given the potentially dispositive nature of the Listings, Plaintiff had much to prove

at Step 3.  The Supreme Court explains:

> The Secretary [now, the Commissioner] has set the medical criteria defining the listed impairments at a higher level than the statutory standard. The listings define impairments that would prevent an adult regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'...  The reason for this difference between the listings' level of severity and the statutory standard is that ... the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.  That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

*Zebley*, 493 U.S. at 532 (internal citations omitted).

The ALJ considered all of the evidence of record and reasonably determined Plaintiff had generalized anxiety disorder with secondary recurrent depression and reasonably determined that Plaintiff did not have a true bipolar disorder.  (Tr. 25-26, 32). In making these determinations, contrary to Plaintiff's contentions, the ALJ did not err in reasonably relying on Dr. Buban's testimony.  (Tr. 26, 400-01).  Dr. Buban reviewed Plaintiff's medical record and found that he did not have panic attacks or a true bipolar disorder.  (Tr. 394-400).  Significantly, even though Plaintiff claims he had been diagnosed with different mental disorders – such as panic disorder with agoraphobia – Plaintiff has not shown that the differing diagnoses, or any mental health source opinions, should have led the ALJ to find that he met or equaled Listings 12. 04 or 12.06.  As discussed above, the ALJ recognized that Plaintiff's asthma, mild obesity, and generalized anxiety disorder with secondary recurrent depression were severe impairments that limited his ability to work.  (Tr. 25-32).  Merely because Plaintiff was diagnosed with other mental conditions, those diagnoses alone did not necessitate a finding of disability.  *See Higgs*, 880 F.2d at 863; *see also Young*, 925 F.2d at 151; *Kennedy*, 247 Fed.Appx. at 767.

Plaintiff met part A of Listings 12.04 and 12.06 because the evidence showed he

had generalized anxiety disorder with secondary recurrent depression. However, Plaintiff did not satisfy the B criteria of Listings 12.04 and 12.06. To satisfy the B requirements of Listings 12.04 and 12.06, Plaintiff had to establish at least two of the following limitations: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See* Listing §§12.04B and 12.06B, 20 C.F.R. Part 404, Subpart P., Appendix 1.

The ALJ reasonably found that Plaintiff did not satisfy the B criteria of Listings 12.04 and 12.06. (Tr. 26-27). Because of his mental condition, Plaintiff experienced few restrictions in the activities of daily living. He lived with his wife and three children, cooked, cleaned up, cleaned the house, vacuumed, dusted, made the beds, pulled out the furniture, cleaned the curtains, cleaned the bathroom, and did the laundry. (Tr. 142-43, 162-64, 219, 329, 366-67, 381, 389). He drove with someone; traveled from Florida to Ohio and back to Florida; went shopping with someone; visited his parents; visited his brothers two to three times a week; helped his children with their homework; supervised the children on their chores; used the computer to play games; picked up things in the yard; watered the plants; and although he did not do yard work because of asthma and his weight, he cut the grass and walked. (Tr. 162-66, 219, 271-77, 298-99, 325, 329, 366-68, 381, 390-91).

The ALJ also reasonably found Plaintiff had moderate (not marked) difficulties in maintaining social functioning. (Tr. 27). After examining Plaintiff, Dr. Bonds found Plaintiff's ability to relate to peers, supervisors, or the public was severely limited. (Tr. 337). In addition, the medical expert, Dr. Buban, concluded Plaintiff could do no dealing with the public, no close over-the-shoulder supervision, and occasional contact with coworkers (Tr. 401-02). Plaintiff did, however, visit family 2 to 3 times a week (Tr. 325), and he was pleasant and cooperative (Tr. 215, 250, 327- 28). In addition, the ALJ

reasonably found Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 27). Plaintiff maintained satisfactory attention and concentration during an interview, and was able to understand and follow directions. (Tr. 330). Throughout the record, however, Plaintiff was anxious, tense, angry, and irritable. (Tr. 215-16, 219, 271-77, 298-99, 328).

Lastly, the ALJ reasonably determined that there is no evidence in the record that Plaintiff experienced episodes of decompensation. (Tr. 27). Plaintiff lived independently and drove a car when someone was in the car with him. (Tr. 142-43, 162-66, 366-68, 381, 389-91). Substantial evidence therefore supports the ALJ's finding that Plaintiff mental impairments did not meet or equal Listings 12.04 and 12.06.

### 3.
### Step 2

Lastly, Plaintiff met his burden at Step 2 to show that he suffered from a severe impairment. This led the ALJ to continue his sequential evaluation through the remaining Steps considering Plaintiff's severe and non-severe impairments. *See* Tr. 25-33. Consequently, Plaintiff's attempt to show reversible error at Step 2 lacks merit. *See Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008)(citing *Maziarz v. Secretary of HHS*, 837 F.2d 240, 244 (6th Cir. 1987)(parenthetical omitted).

### B.     Plaintiff's Third and Fourth Claimed Errors

In his third and fourth assertions, Plaintiff claims:

3.      The ALJ's vocational decision at Step 5 violates the mandate of the Appeals Council and SSR [Social Security Ruling] 00-4p.

4.      Considering the effect of the factual and legal errors of the ALJ, the ALJ's decision of February 11, 2008 is not supported by substantial evidence on the record as a whole and is contrary to law. Evidence of disability is strong and opposing evidence is lacking in substance. Therefore, disability insurance benefits and SSI should be granted on this record.

(Doc. #8 at 1-2).

Plaintiff argues that the ALJ asked the vocational expert a deficient hypothetical question because it did not include all of his impairments. Plaintiff asserts that the ALJ should have included limitations related to his panic attacks and agoraphobia.

A proper hypothetical question should accurately describe the claimant "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *see Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1987). "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of HHS*, 39 F.3d 115, 118 (6th Cir. 1994).

Contrary to Plaintiff's contentions, the ALJ's hypothetical question to the vocational expert was adequate and proper because it included all Plaintiff's substantiated impairments and resultant limitations. Indeed, the hypothetical question that the ALJ posed took into consideration limitations that accurately reflected the difficulties that Plaintiff experienced and that were supported by the record as a whole. *See* Tr. 405-06. Based on the evidence of record, the ALJ reasonably determined that because of his impairments, Plaintiff could do unskilled light work that allowed for standing up to 30 minutes at a time or 3 hours total; walking 5 minutes at a time or one hour total; no crawling, crouching, or climbing ladders or scaffolds; occasional stooping, kneeling, and climbing stairs; no work at unprotected heights, around moving machinery or temperature extremes, in wet or humid areas, or where there would be concentrated exposure to fumes, smoke, dust, odors, or poor ventilation; no considerable exposure to vibration or noise; no contact with the public; no over the shoulder job supervision or otherwise having greater than occasional contact with supervisors; occasional contact with coworkers (with no requirement of working as part of a team with others on specific job projects; and simple, repetitive and low stress work (not do jobs that involve fixed

production quotas or involve above average pressure for production work that is other than routine in nature or hazardous. (Tr. 405-06).

The ALJ explained that he did not include the additional limitations Plaintiff alleged because the evidence did not support such limitations. (Tr. 26). Plaintiff errs by relying on diagnoses and by not relying on objective medical evidence or test results or properly supported medical source opinion(s) demonstrating that he has limitations more severe than the ALJ found. The ALJ properly included limitations in his hypothetical question to the vocational expert that were supported by substantial evidence.

Plaintiff claims that the vocational expert impeached his own answer to the ALJ's hypothetical question regarding the jobs he could perform. The vocational expert testified that unskilled work involves proximity to others. (Tr. 407). Plaintiff mistakenly assumes that the ALJ included in his hypothetical question "no close proximity to co-workers." But, a close reading of the administrative hearing transcript reveals the ALJ did not include a limitation of "no close proximity to co-workers." (Tr. 405-06). The ALJ instead included a limitation of occasional contact with coworkers with no requirement of working as part of a team with others on specific job projects. (Tr. 406).

Plaintiff also assumes that the ALJ included no production requirements in the hypothetical question. Yet, the ALJ did not include a limitation of no production requirements in his hypothetical question. The ALJ instead limited Plaintiff to simple, repetitive, and low stress work that did not involve fixed production quotas, or otherwise involve above average pressure for production work that is other than routine in nature. (Tr. 406).

Plaintiff contends that the final assembler job, which was identified by the vocational expert as a job Plaintiff could perform, was not in compliance with the Dictionary of Occupational Title (DOT). Plaintiff asserts that the final assembler job is listed in the DOT as medium strength and has an special vocational preparation of 6, or skilled work. However, the DOT contains a job category of final assembler, which is

listed as sedentary work with a special vocational preparation of 2, or unskilled. *See* DOT No. 713.687-018; *see also* Social Security Ruling 00-4p; 20 C.F.R. §404.1568. Significantly, all other jobs the vocational expert cited – mail clerk, photocopy machine operator, cafeteria attendant, lens inserter, and dowel inspector – fit within the parameters of the ALJ's hypothetical question. (Tr. 404-06). As a result, the vocational expert's testimony was consistent with the DOT.

It appears that Plaintiff also claims that he could not do the light jobs because according to Social Security Ruling 83-10, the ability to do light work requires either standing or walking 6 to 8 hours.

The definition of light work states that a job is in this category even when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §404.1567(b); *see* Social Security Ruling 83-10. Even though Plaintiff could stand/walk a total of 4 hours a day, he could still perform light work. Even assuming Plaintiff could not perform light work, there were 3,100 sedentary jobs, or a significant number of jobs, that he could perform. *See Hall v. Bowen*, 837 F.2d. 272, 275 (6th Cir. 1988) (1,350 jobs was a significant number of jobs).

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be affirmed; and

2.      The case be terminated on the docket of this Court.


January 27, 2010                                    <u>     s/ Sharon L. Ovington        </u>
                                                    Sharon L. Ovington
                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).